## Bazzell v. Bennett.

(Decided February 20, 1917.)

### Appeal from Hickman Circuit Court.

Attorney and Client.—Evidence examined and conclusion reached that it did not so sufficiently show that the relation of attorney and client existed as to prevent the attorney from making a contract that he would not have been allowed to make if the relation of attorney and client had existed.

SHELBOURNE & SHELBOURNE and J. M. BRUMMAL, JR., for appellant.

JOE W. BENNETT, ROBBINS & ROBBINS and J. E. WARREN for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The appellant, Bazzell, as plaintiff, brought this suit against the appellee, Bennett, which suit on hearing was dismissed.

In his petition Bazzell averred, in substance, that on September 23, 1914, he and W. C. Samuel entered into a contract with one George Warner whereby they purchased from him 235 acres of land which Warner had bought from G. W. Dodson. That in consideration of the sale of the land, they assumed the payment of certain purchase money notes due by Warner to Dodson. That as part of the contract Warner was to convey to Samuel 48 acres of the land and to Bazzell the remainder, 187 acres. That pursuant to the contract with Warner they were to see Dodson and get him to agree to their assumption of the Warner notes. That on September 24th they went to see Dodson and explained to him the contract with Warner and were told by him that after he had consulted his attorney he would meet them in Clinton on September 26th and close the matter up. That on their return from Mayfield where they saw Dodson they went to see Bennett, an attorney at Clinton, and

explained to him the purchase they had made from Warner, the land each was to receive, the terms thereof, and the arrangements made with reference to the assumption by them of the notes due Dodson, and Bazzell employed him as an attorney to represent him in the action and to draw up the deed and other necessary papers to secure to him (Bazzell) the title to the land. That Bennett accepted the employment and agreed to prepare the necessary papers. That on the same day they notified Warner to meet them at Clinton on September 26th, telling him that Dodson would be there to close up the matter. That on September 25th, and after Bazzell had employed Bennett to write the deed from Warner for the 187 acres of land and he had accepted the employment, Bennett purchased the land from Warner and procured a conveyance of it to be made to him. That on September 26th, pursuant to the arrangements made between all the parties, Bazzell and Dodson met in Clinton for the purpose of having Bennett write the papers agreed on, when they discovered for the first time that he had purchased the land himself. The prayer of the petition was for a judgment decreeing that Bennett purchased the land to be held in trust for the use and benefit of Bazzell and that he be required to convey to him the land, or, if this could not be done, that he have judgment for $2,095.00, the amount of damage he had sustained by the failure to get the land at the contract price.

In his answer Bennett specifically denied all the material averments of the petition, except so much as related to the fact that he had purchased the land, which was admitted.

In considering the record we think the opinion may be confined to the evidence relating directly to three propositions: (1) Did Warner contract to sell the land to Bazzell? (2) Did Dodson, whose agreement was necessary to the consummation of the contract, consent to the sale? (3) Did Bazzell employ Bennett to write the deed and such other papers as might be necessary to complete the sale and purchase of the land, and did Bennett agree to perform this service?

George Warner testified that he did not make any contract with Bazzell for the sale of his land. That Bazzell in company with W. C. Samuel came to see him, and Bazzell made him a proposition to buy the land, which proposition contemplated that Dodson, who held the purchase money notes against Warner, would agree that

Bazzell might assume the debt, and that he told Bazzell he might go and see Dodson if he wanted to; that after they left he went to see Bennett, who advised him not to sell the land to Bazzell and that he made up his mind not to do it. That no writings were ever executed between them, is admitted.

Bazzell said that Warner first came to see him about buying his land and that on the next day—Thursday—he went to see Warner with Samuel, and Warner told him what he would take and he accepted his proposition provided Dodson would agree to it. That he went to Mayfield to see Dodson on Thursday, and Dodson said he was not at that time ready to say what he would do but would let him know the next morning. That on Friday morning he went to the office of Bennett and told him about the trade he had made with Warner, which he expected to be consummated as Dodson would agree to it, and that he wanted Bennett to write a contract and a deed the next day. That Bennett said to him, ''Come back, and anything I can do for you I will do it.'' That he asked him what he would charge and he said, ''I won't rob you.''

He further said that Dodson told him on Friday over the telephone, the same day he talked to Bennett, that he would meet him in Clinton on Saturday morning and to have Warner there. That on Saturday morning when they all met in Clinton he learned for the first time that Bennett had bought the land and then said to him that if he had told him that he could not attend to the matter for him he would have gotten another attorney. That he told Bennett on Friday morning when he had the talk with him at his office that he and Warner had traded and that he wanted him to write the papers. That Bennett did not tell him, after hearing his version of the trade, ''that Warner had not made any trade with him, and he did not need any deeds or contracts written until he and Warner had traded.'' He said his trade with Warner was closed if Dodson would agree to it and that Dodson did on Saturday morning when he came to Clinton agree to accept him as payor for the debt due by Warner, and this removed all obstacles to the trade.

On cross-examination by the appellee, Bennett, he was asked these questions and made these answers: ''Q. You told Bennett that you had done made a trade with George Warner? A. Yes, sir; I told you. Q. You told me that you wanted me to write a contract for you that

morning? A. Yes, sir, I did. Q. Why didn't I write one that morning? A. You says, 'I am very busy; you and Will go back and I will write one. Anything that I can do for you I will do it.' That was when we started out of the door, and I says, 'Mr. Bennett, what will you charge?' and he says, 'I won't rob you.'"

W. C. Samuel testified that after he and Bazzell had gone to Warner's and from there to Mayfield to see Dodson, they went to Bennett's office on Friday morning and spoke to him about writing the contract. He said: "I had bought the 48 acres of land from Warner and Bazzell was to get the 187 acres. Bennett understood my part of the contract with Warner because he had written it." He was further asked and answered: "Q. Anything said to Mr. Bennett about the land Bazzell was to get? A. We told him what part. Q. What part did you tell him he was to get? A. All on the east side of the Hailwell and Columbus road. Q. Mr. Bazzell say anything about employing him? A. Just told him he wanted him to write a contract like the one I had with him. Q. What did Mr. Bennett say? A. He asked if Warner had accepted our proposition. He said: 'Bring him up here, then I will write it.' That is about all he said. Q. Mr. Bazzell ask him how much he would charge to represent him? A. I don't remember that he did. Bennett asked me if we had closed a trade with Warner and I told him we had."

He further testified that nothing was said about a verbal contract between them and Warner, nor did Bennett tell him that Warner had not made any trade with them or that they could not enforce the verbal contract they had with Warner, nor did he say that they did not need a contract until the trade was made. He also said that he went on Thursday morning with Bazzell to see Warner and that Warner accepted the proposition that Bazzell made him. That they then went to Mayfield to see Dodson.

It further appears from his evidence that Bennett had written a contract between Samuel and Warner for the sale of the 48 acres of land a few days before Bazzell undertook to buy the 187 acres and made the contract he relates with Warner about its purchase. He also said that when he and Bazzell were talking with Bennett they told Bennett that they had traded with Warner provided Dodson would accept the proposition.

On cross-examination by Bennett he was asked and said: "Q. Now when Bazzell said that he wanted me to write a contract for him for the land on the east side of the road like the one that I had written for you, or something to that effect, don't you remember that I said to him that 'if you have made a trade with Warner and want me to write a contract, bring him up here?' A. You said to bring Warner up there and you would write the contract. Q. Bazzell did say that he wanted me to write the contract that morning? A. Yes, sir; he did say that when he went up in the office. Q. Warner refused to come to my office to have the contract written? A. Said there was no use; said that he would make the deed in the morning; said there was no use to make the contract on Friday and the deed on Saturday morning; said there was no use to have a contract and a deed too."

Dodson testified that Bazzell and Samuel came to see him on Thursday, September 24th, but they did not on that day make any kind of a trade with him by which they were to assume the payment of the notes Warner owed him for the land. That he told them he would let them know over the telephone whether he would accept the proposition or not, and that he did on the next day tell Bazzell or Samuel that he would meet all of them in Clinton on Saturday morning and to have Warner there. That he did not at any time make any trade with Bazzell by which he was to accept Bazzell in place of Warner as payor in the notes due him by Warner. That he did go to Clinton on Saturday morning and met Samuel and Bazzell there but did not see Warner except at a distance. That when he got to Clinton he found out that the trade was off as Bennett had bought the land, but that Bazzell told him he was prepared to get the money and pay cash for the land.

Warren, the attorney for Dodson, testified that he advised Dodson not to accept the proposition that Samuel and Bazzell made to him in Mayfield.

Bennett, testifying in his own behalf, said that some time previous to the day Samuel and Bazzell called on him, Warner had employed him to represent him in a suit Dodson had brought on the notes and that on Friday morning, September 25th, Warner came to his office and told him that Bazzell was trying to buy the 187 acres of land under a contract by which Bazzell was to pay to Dodson the remainder of the purchase money due on the land after crediting it by what Samuel would pay

for the 48 acres that he had bought, and that he advised Warner that if he made such a contract he would lose from fifteen hundred to two thousand dollars and ought not to make the contract, and that when he told him this he said he would not make any trade with Bazzell. That in the course of the conversation he told Warner that he would buy the land if Warner's wife would sell him some land that she owned, and it was agreed between them that he would go down to Warner's house and see Warner's wife about it. That soon after having this conversation, Warner left his office, and a few hours later Bazzell and Samuel came into the office, and Bazzell said to him: "Me, Will Samuel, Warner and Dodson have made a trade: Samuel is to take the land on the west side of the road and pay $90.00 an acre for it, and whatever it amounts to is to be paid on the Dodson notes, and I am to pay the remainder of the Dodson notes for the land on the east side of the public road." "I said, 'Warner has made no trade with you.' He says, 'Yes, he has; we have done traded. Ain't a verbal contract good for the sale of land?' I said, 'No, you can't enforce a verbal contract for the purchase of land.' He says, 'Well, we have done traded and I want you to write a contract this morning.' I said, 'All right, if you have done traded, but I know Warner has not traded with you.' He says, 'What will you charge me to write a contract?' I says, 'You don't need any contract written until you make a trade.' And that was all of the conversation."

He further testified that on the evening of that Friday, he went to Warner's house and bought the 187 acres of land in controversy. That on that morning, before he had seen Bazzell and Samuel, he had made a contract with Warner to buy the land provided his wife would sell him the fifteen acres which she owned, which she did. That Bazzell did not employ him as an attorney to write any contract and that he knew from what Warner had told him that no trade had been made, and he had virtually purchased the land from Warner before Bazzell came to see him, but he did not tell Bazzell anything about his purchase.

It further appears that Warner was in Clinton at the time Bazzell and Samuel had their conversation with Bennett and that after having the conversation with him they saw Warner and wanted him to go back to Bennett's office and have the contract written, but Warner refused

to go, saying, according to the statements of Bazzell and Samuel, that there was no use in it, as they were coming back to make the deed.

Sam Hoskins and Clay Parrott also testified, in sub-stance, that some time during that day, and after the conversation between Samuel, Bennett and Bazzell, Baz-zell came back to Bennett's office and told Bennett that he would not need him to write up any contract between himself and Warner as Warner would not come up in the office. Bennett also testifies to the same facts, but Baz-zell denies that he made the statements attributed to him by these witnesses.

The substance of this evidence is that Warner owned a body of land of 48 acres on one side of the road and 187 acres on the other, that he had bought from Dodson, who had brought suit against him to enforce the pay-ment of the purchase money notes, and Warner had em-ployed Bennett as his attorney to defend this suit, which was pending when the conversations took place between Bazzell and Bennett. That Samuel on September 18th purchased from Warner the 48 acres of land, and on the following Thursday, September 24th, Bazzell, in com-pany with Samuel, went to see Warner about buying the 187 acres. That Bazzell proposed to buy the land and assume the payment of the balance of the purchase money due Dodson, provided Dodson would agree to this. Bazzell and Samuel say Warner accepted this proposition but Warner denies it. That on this day they went from Warner's to Mayfield to see Dodson and as-certain if he would be willing to take Bazzell in place of Warner as payor of the balance due on the purchase price. That Dodson declined on that day to agree to this but told them he would telephone them. That on the next day he did telephone them to meet him in company with Warner at Clinton on Saturday morning. It further ap-pears that when he reached Clinton on Saturday morn-ing he had not agreed to accept the proposition made to him by Bazzell, and learned on that morning soon after reaching Clinton that the trade between Bazzell and Warner could not be made because Warner had sold the land the day before to Bennett.

It further appears that early Friday morning War-ner came to see Bennett and told him about the offer Bazzell had made to him on the day before to buy his land and what he would pay for it, but that he had not yet made any trade with Bazzell. That Bennett advised

him not to accept the proposition of Bazzell, because if he did he would lose between fifteen hundred and two thousand dollars. That Bennett then proposed to buy the land himself provided Warner's wife would join in selling a piece of land she owned, and Warner and Bennett agreed on the terms, and late that evening the trade between Bennett and Warner and his wife was closed by the execution of proper deeds. That on Friday, some little while after the conversation between Bennett and Warner, and after Warner had left his office, Bazzell and Samuel came in and had the conversation with Bennett in reference to writing the contract between Bazzell and Warner. That at this time Bassell, although he believed he had made a trade with Warner, did not know whether it could be consummated or not, because Dodson had not agreed to it, nor did he know of the conversation between Bennett and Warner or that Warner had agreed to sell the land to Bennett. We think it may further be assumed that Bazzell believed that the trade between himself and Warner would be closed and that he had employed Bennett to write the contract, but Bennett says that he had not agreed to write any contract nor had he accepted any employment to do so.

On these facts we think the judgment of the lower court dismissing the petition of Bazzell was correct.

Passing the question as to whether any contract was made between Warner and Bazzell, or if made whether it was consented to by Dodson, we may put our decision on the ground that the evidence does not sufficiently show that the relation of attorney and client in respect to this matter existed between Bennett and Bazzell. On this vital issue there is sharp dispute in the evidence, but we think the weight of it is with Bennett.

Wherefore, the judgment is affirmed.